UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROY ANDREWS,

     Plaintiff,

v.                                   Case No. 08-14391

PRUDENTIAL INSURANCE COMPANY       HONORABLE AVERN COHN
OF AMERICA, and DOMTAR INDUSTRIES,
INC., LONG TERM DISABILITY PLAN FOR
SALARIED EMPLOYEES,

     Defendants.

_____/

**MEMORANDUM AND ORDER**
**DENYING DEFENDANT PRUDENTIAL INSURANCE COMPANY OF AMERICA'S**
**MOTION TO AFFIRM THE ADMINISTRATOR'S DECISION**

I.  Introduction

This is a benefits case under the Employment Retirement Income Security Act,

29 U.S.C. § 1001, et seq (ERISA).  Plaintiff Roy Andrews is suing defendants Prudential

Insurance Company of American (Prudential) and Domtar Industries Inc., Long Term

Disability Plan for Salaried Employees.  He claims that Prudential wrongfully denied his

claim for long term disability benefits under a group insurance policy (Plan) held by his

former employer, Domtar Industries, Inc. (Domtar).  As will be explained, Prudential

initially found Andrews disabled under the plan but two months later determined he was

not disabled and terminated his benefits.  Andrews says this decision was arbitrary and

capricious.  The Court agrees.

The matter is before the Court on Prudential's motion to affirm the administrator's

decision.  For the reasons that follow, the motion is DENIED.

## II.  Legal Standard  -  Motion for Entry of Judgment

In Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609 (6th Cir.1998), the

Court of Appeals for the Sixth Circuit held that summary judgment procedures may no

longer be used in the Sixth Circuit in denial of benefits actions under ERISA.  In Wilkins,

the court of appeals decided a district court should adjudicate an ERISA action as if it

were conducting a standard bench trial and, therefore, determining whether there is a

genuine issue of fact for trial would make little sense.  150 F.3d at 618-19 (Gilman, J.,

concurring in part and setting out the judgment of the court of appeals on the issue

regarding the summary judgment standard).

Accordingly, the Court will decide this matter under the guidelines set forth in

Wilkins[1] by rendering findings of fact and conclusions of law based solely upon the

administrative record.  See Eriksen v. Metropolitan Life Ins. Co., 39 F. Supp. 2d 864

---

[1] The court of appeals' "Suggested Guidelines" are as follows:
1. As to the merits of the action, the district court should conduct a de novo review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly.  The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.
2. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part.  This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.
3. . . . the summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition.
150 F.3d at 619.

(E.D. Mich. 1999).

### III.  Analysis

#### A.  Standard of Review

The parties agree that the standard of review in this case is whether the denial of benefits was arbitrary and capricious because Prudential had discretionary authority to construe and interpret the policy.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991). This standard is the "least demanding form of judicial review."  Administrative Committee of the Sea Ray Employees Stock Ownership and Profit Sharing Plan v. Robinson, 164 F.3d 981, 989 (6th Cir. 1999).  This requires "review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." McDonald v. W.-S. Life Ins. Co., 347 F.3d 161, 172 (6th Cir.2003).  The plan administrator's decision should be upheld if it is "the result of a deliberate, principled reasoning process" and "supported by substantial evidence."  Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006), aff'd, Met. Life Ins. Co. v. Glenn, --- U.S. ----, 128 S.Ct. 2343 (2008).  The standard, although deferential, is not "inconsequential."  Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005).  "While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions."  Id.

Moreover, the Sixth Circuit has made clear that a court is to consider several factors in reviewing a plan administrator's decision, including the existence of a conflict of interest, the plan administrator's consideration of the Social Security Administration determination, and the quality and quantity of medical evidence and opinions.  Glenn,

461 F.3d at 666.

Here, Andrews says a conflict of interest exists because Prudential was both responsible for reviewing and paying benefits.  The Supreme Court recently held that a conflict of interest exists for ERISA purposes where the plan administrator evaluates and pays benefits claims, even when, as here, the administrator is an insurance company and not the beneficiary's employer.  Glenn, 128 S.Ct. at 2348-50.  We give more weight to the conflict "where circumstances suggest a higher likelihood that it affected the benefits decision...."  Id. at 2351.  A conflict may affect a benefits decision in several ways.  For example, although the treating physician rule does not apply in ERISA cases, the Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832, (2003).  The Sixth Circuit has observed that when a plan administrator both decides claims and pays benefits, it has a "clear incentive" to contract with consultants who are "inclined to find" that a claimant is not entitled to benefits.  Kalish v. Liberty Mutual/Liberty Life Assurance, 419 F.3d 501, 507 (6th Cir. 2005).  The Court will consider Prudential's conflict in evaluating its decision to deny Andrews benefits.

### A.  Findings of Fact

The following facts are gleaned from the administrative record.

### 1.  Relevant Plan Provisions

### a.  Definition of Disability

The plan defines disability as follows:

You are disabled when Prudential determines that:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and

- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

### b.  Right to Review

Prudential reserved the right to have a claimant examined:

We may review you to be examined by doctors, other medical practitioners or vocational experts of our choice.  Prudential will pay for these examinations.  We can require examinations as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Prudential Representative.  Refusal to be examined or interviewed may result in denial or termination of your claim.

### 2.  Andrews' Claim

As of April 2005, Andrews had been employed by Domtar in the positions of a maintenance planner, electrician, production supervisor, and a fire control person.  His work was skilled and semi-skilled and required a medium level of exertion.  Domtar explained that his position required bending, stooping, twisting, turning, walking on irregular surfaces, climbing, crouching, sitting, standing, kneeling, balancing, reaching, feeling, finger movement, grasping, hearing, depth perception, color vision, and speaking clearly.

On August 28, 2006, Andrews filed a claim for disability benefits.  He states that he stopped working on April 11, 2006 due to Cushing's Syndrome, ACTH-dependent

with ectopic tumor source, secondary diabetes, secondary degenerative joint disease caused by high concentrations of cortisol, hypertension, weakness, fatigue and pain. His treating physicians include Dr. Annette Mercatante, M.D., a Family Practice physician, Dr. Susham Reddy, an endocrinologist, and Dr. William Young, M.D., an endocrinologist at the Mayo Clinic.

The medical evidence shows that on July 27, 2005, Andrews was first seen by Dr. Mercatante at which time his blood pressure was 193/136.  He was immediately taken to the emergency room at Port Huron Hospital.  He was diagnosed with hypertension and diabetes and placed on insulin and blood pressure medication.

Dr. Mercatante referred Andrews to Dr. Reddy.  Dr. Reddy examined Andrews in September 2005.  After several tests, he diagnosed Andrews with Cushing's syndrome. In October, Andrews saw Dr. Reddy again complaining of severe weakness, tiredness, and aching in his arms.  Andrews was hospitalized and placed on medications.  He was diagnosed with hypogonadotropic hypogonadism.

Andrews was also seen by Richard Kovar, D.O., a neurologist.  He assessed proximal muscle weakness which resolved with potassium supplements, no signs of neuromuscular diseases or neuropathy, Cushing's syndrome, sever hypokalemia, uncontrolled diabetes, hypertension, mild thrombocytopenia.

Dr. Reddy referred Andrews to Dr. David Schteingart, M.D. at the University of Michigan, for evaluation of his Cushing's syndrome.  Andrews was seen in December 2005.  Dr. Schtenigart's notes show that he believed a carcinoid tumor was the most likely cause of Andrew's ectopic production but imaging studies had not located the tumor.  He recommended a hormone releasing test.  January 2006 notes show Dr.

6

Schteingart believed Andrews' hormone production was the result of a pulmonary carcinoid tumor, but also recommended ruling out a pituitary tumor.

On February 3, 2006, Andrews underwent a procedure to determine if he had a pituitary tumor.  He was then seen by Dr. William Chandler, a neurosurgeon at the University of Michigan, who performed a "trassphenoidal resection of pituitary gland" in March of 2006.

Andrews sought a second opinion regarding his condition.  He went to the Mayo Clinic and was seen by Dr. William Young, an endocrinologist.  He evaluated Andrews' file and determined that he needed a "bilateral adrenalectomy."  Andrews had the procedure in June 2006.  Post surgical reports show that Andrews' condition has improved, but he still suffers from the effects of Cushing's syndrome.

As to his claim, on October 12, 2006, Prudential told Andrews it needed medical records from Drs. Reddy, Young, Ebaugh and Walmart from February 2005 through the present, as well as any other records.

A November 1, 2006 note from Sandra Chapkovich, R.N., provided the following clinical review:

> Andrews is a 43 year old maintenance person, classified as long term disabled, out of work since April 11, 2006 with Cushing's syndrome who underwent an adrenalectomy on June 15, 2006.  He has a history of hypertension but, per office notes on August 23, 2006 [Dr. Reddy] it appears controlled as long as he takes his [medications]. . . It appears his primary impairment is continued deconditioning, lack of muscle strength, weakness; he also complains of edema in lower extremities after standing for prolonged periods of time.  He also has myalgias and arthralgias which are being followed by Dr. Mercatante, his personal physician.  Dr. Reddy felt that he would benefit from a course of physical therapy for reconditioning . . . it does not appear he has started any physical therapy . . . it is difficult to assess his functional capacity without a recent comprehensive physical evaluation from his doctor with treatment plan, restrictions/limitations and return to work plan.  It would be helpful to obtain both

PCP and Endocrinology most recent OVNs and follow up with Andrews to determine what his activities of daily living are at this time and if he has started PT.

Despite Chapkovich's recommendation to obtain more information, that same day, November 1, 2006, Prudential advised Andrews that it had completed its review and determined he was disabled under the plan as of September 8, 2006.  The letter stated in part:

> We have reviewed the medical information provided by your treating physicians and have determined that you are disabled, due to Cushing's Syndrome, from your regular occupation as required by the definition above. Medical records indicate that your diagnoses of Hypertension and Diabetes are controlled and therefore, are not considered as part of this disability claim.

Prudential also said it may review his file to determine if rehabilitative services would help him return to work.  Prudential further said that under the plan, it had the right to require Andrews to seek Social Security benefits, but was not requiring him to do so at this time.

However, two months later, on January 18, 2007, Byron Saavedra, R.N. reviewed Andrews' file.  He noted that Andrews' deconditioning and muscle weakness had significantly improved and that from a surgical standpoint, Andrews should have been able to perform sedentary work as of November 2006.  With 4-6 weeks additional recovery time, he should be able to perform at least light work.

Accordingly, on January 25, 2007, Prudential sent Andrews another letter stating that "we have terminated your claim and no further benefits are payable."  Prudential essentially outlined Mr. Saavedra's findings regarding Andrews' ability to work.

Andrews appealed.

On appeal, he submitted "Physician Residual Functional Capacity

8

Questionnaires" from Drs. Reddy, Mercatante, and Young.  Dr. Reddy has treated

Andrews in her clinic since September 2005.  On March 27, 2007, Dr. Reddy completed

a questionnaire and attached notes from a clinical evaluation of Andrews.  Dr. Reddy

opined that.  Andrews has Cushing's Syndrome, which has required an adrenalectomy.

Andrews also has hypertension, diabetes, and vitamin D deficiency complications.  He

also continues to suffer "severe muscle aches and fatigue causing inability to work" as a

result of his condition, and this constantly interferes with his attention and concentration.

He is not a malingerer, and emotional factors do not contribute to his functional

limitations, although it would be possible for him to have depression.

As to his ability to work, Dr. Reddy states that Andrews is unable to work an 8-

hour day but may be capable of a low stress job.  For physical limitations, he cannot

stand for more than 15 minutes before needing to sit down, and he cannot sit for more

than 30 minutes before needing to stand up.  Andrews cannot lift 50 pounds, and he

can lift 10-20 pounds only rarely.  He cannot ever stoop, bend, crouch, or climb ladders,

and he can climb stairs only rarely.

Dr. Mercatante, who has treated Andrews since 2005, opined on March 9, 2007

that Andrews needs ongoing care related to Cushing's Syndrome, hypertension,

degenerative joint disease, diabetes, intractable pain, and congestive heart failure.  She

also stated that Andrews experiences severe pain, intolerance to minimal exertion, and

labile hypertension.  His pain is diffuse, primarily joint pain that is also characterized by

muscle spasms.  Dr. Mercatante also stated that Andrews has clinical findings and

objective signs that include muscle atrophy, joint effusions, and abnormal labs.  She

also found that he Andrews is not a malingerer, and emotional factors do not contribute to his functional limitations.  Andrews' pain constantly interferes with his attention and concentration.

As to his ability to work, Dr. Mercatante said that Andrews is incapable of working in even "low stress" jobs.  For physical limitations, Andrews would need his legs elevated 50% of the day in even a sedentary job.  He can rarely lift less than 10 pounds, and he cannot ever lift more than 10 pounds.  He also cannot ever twist, stoop, bend, crouch, climb ladders, or climb stairs at work.  Andrews cannot stand for more than 15 minutes before needing to sit down, and he cannot sit for more than 30 minutes before needing to stand up.  Finally, Dr. Mercatante said that Andrews is likely to be absent from work "most days per month" as a result of his impairments.

Dr. Young treated Andrews at the Mayo Clinic beginning in June 2006.  On the questionnaire dated February 20, 2007, he confirms that Andrews has Cushing's Syndrome – ectopic and also experiences joint pain, exercise intolerance, vertigo, and cognitive dysfunction.  Dr. Young also says that Andrews is not a malingerer, and emotional factors do not contribute to his functional limitations.  Dr. Young says that these physical impairments are consistent with his symptoms and physical limitations.

As to his physical limitations and ability to work, Dr. Young said that Andrews cannot stand for more than 15 minutes before needing to sit down, and he cannot sit for more than 30 minutes before needing to stand up.  He cannot sit or stand for two hours in an 8-hour workday, and he would need periods of "reclining" throughout any workday.  He cannot work an 8-hour day.  Additionally, Andrews cannot lift over 10 pounds, can only rarely stoop, crouch, or climb stairs, and he cannot climb ladders at all.  Dr. Young

says that Andrews is likely to be absent from work "most days of the month."  Finally,

Dr. Young says that these physical impairments are consistent with his symptoms.

In addition to the reports from Drs. Reddy, Mercatante, and Young, Andrews also

submitted a copy of a favorable Social Security determination.  His claim for benefit was

initially denied; however Andrews requested a hearing before an administrative law

judge (ALJ).  The ALJ determined that Andrews was disabled under the Social Security

Act from March 15, 2006 as a result of Cushing's syndrome, diabetes, degenerative

joint disease, and hypertension.  The State Agency argued Andrews was capable of

light work.  The ALJ disagreed, stating:

> . . . New and material evidence in this case helps convince me that the
> claimant has as much lesser exertional capacity.  Based on the reports from Dr.
> Reddy, Dr. Young and Dr. Mercatante, the claimant cannot do sedentary
> unskilled work on a sustained basis.  The claimant remains very symptomatic
> from his Cushing's syndrome.  Dr. Mercatante stated that the claimant has
> intractable pain.  Again, he described the pain as severe.  He has also reported
> generalized weakness, atrophy, and abnormal laboratory tests.  Dr. Mercatante,
> Dr. Young and Dr. Reddy markedly limited the claimant's ability to sit, stand,
> walk, and lift.  Dr. Reddy states that the claimant cannot work due to severe
> fatigue.  He also reported severe muscle aching.  He further reported dizziness.
> All three of these doctor [sic] stated that the claimant would be absent from a job
> multiple times a month.  Dr. Young states that the activity aggravates the
> claimant's pain, and he noted vertigo and cognitive dysfunction.  Dr. Mercatante
> states that the claimant cannot even tolerate minimal exertion.  I give very
> substantial weight to the reports from these three doctors.

The ALJ further found Andrews to be credible and the medical evidence was consistent

with his symptoms.  As such, the ALJ determined that Andrews "lacks the residual

functional capacity to maintain a regular work schedule, maintain production standards,

or sustain concentration on even simple unskilled tasks."

For its part, Prudential submitted Andrews' file to Dr. Tamara Bowman, an

endocrinologist who performed a paper review of the claim and submitted a Peer

Review Report.  While it appears that Dr. Bowman reviewed many of Andrews' medical records, notably absent from the list of documents reviewed is the Functional Capacity Questionnaire from Dr. Mercatante and Dr. Young.  Dr. Bowman did review the Functional Capacity Questionnaire from Dr. Reddy, who as indicated above, opined that Andrews cannot work.  She also reviewed the Social Security decision.  However, neither Dr. Reddy's Questionnaire nor the Social Security decision are mentioned in her report.  It is unclear whether Dr. Bowman received Dr. Mercatante and Dr. Young's questionnaires and it is unknown why she did not mention Dr. Reddy's Questionnaire or Andrews' favorable Social Security decision in her report.  It also does not appear that Dr. Bowman received Andrews job descriptions as part of her review, which show that his job was an intensely physical occupation.  All of these documents speak directly to Andrews' ability to work and whether he is disabled under the plan.  They are unquestionably relevant.

Instead, Dr. Bowman's report states several times that there are "insufficient examination findings" to support Andrews' claim.  As Andrews points out, the Plan provides that Prudential has the right to require Andrews undergo a physical examination.  Prudential did not do so.  Given the emphasis Dr. Bowman places on a apparent lack of examination findings, the failure of Prudential to have Andrews examined cuts against finding Prudential acted appropriately in denying Andrews' claim.

Another flaw in Dr. Bowman's report is her failure does not tie the medical evidence to the Plan's definition of disability.  Indeed, the report does not describe Andrews' job or set forth the definition of disability.  While Dr. Bowman was asked to list functional limitations and/or restrictions supported by the evidence, she was not asked

about Andrews' ability to work at either his own occupation or any other.  Inexplicably,

Prudential chides Andrews' treating physicians for not being qualified to opine on his

physical limitations, while that is exactly what they asked of Dr. Bowman.


                                B. Conclusions of Law

        Prudential relies heavily on Dr. Bowman's report to show that it did not act

arbitrarily or capriciously in denying Andrews' claim.  As noted above, Dr. Bowman's

report is deficient in several respects.  Not only did Dr. Bowman either not receive or

review critical information from Andrews' treating physicians, her report failed to mention

the critical information she did receive - Dr. Reddy's questionnaire and the Social

Security decision.  Although Prudential argues that the questionnaires are conclusory

and not evidence of Andrews' disability, the Court disagrees.  Prudential makes much of

the fact that the questionnaires do not contain "supporting data."  The "supporting data"

is found from the fact that these are Andrews' treating physicians who examined him

several times and from the medical records, office notes, surgical reports, etc. which are

in the file.  For Prudential to ignore these questionnaires is not reasonable.

        As to the Social Security decision, it is true that a determination that a person

meets the Social Security Administration's uniform standards for disability benefits does

not make her automatically entitled to benefits under an ERISA plan, since the Plan's

disability criteria may differ from the Social Security Administration's.  Whitaker v.

Hartford, 404 F.3d 947, 949 (6th Cir. 2005).  Nonetheless, the Social Security

Administration's decision "is far from meaningless."  Calvert, 409 F.3d at 294.  Although

there is no technical requirement to explicitly distinguish a favorable Social Security

determination in every case, [i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious.  Bennett v. Kemper Nat'l Servs., 514 F.3d 547, 554 (6th Cir. 2008).

Here, Prudential had the right to require Andrews to apply for Social Security benefits.  Although it did not do so, it is not surprising given that Prudential denied his claim two months after it granted it.  Moreover, the Plan does provide for an offset in benefits should a participant obtain Social Security benefits.  Thus, Prudential would gain from Andrews' determination.  Dr. Bowman did not explain, much less mention, the Social Security decision.  Under these circumstances, the fact that Andrews was awarded Social Security benefits points to a finding that Prudential's decision was arbitrary and capricious.

Finally, the conflict of interest in Prudential serving in the dual role in determining benefit eligibility and paying benefits, militates in favor of Andrews.  This conflict is further emphasized by the way in which Prudential handled Andrews' claim.  First, it granted him benefits then, with virtually no additional evidence, promptly denied his claim two months later.  Prudential did not send Andrews for an independent medical examination.  Instead, it chose a peer review.  While Prudential's decision was within its rights, the decision was not reasonable, particularly where the peer review by Dr. Bowman relied on an apparent lack of clinical findings which could have been explored through an independent medical examination.

14

IV.  Conclusion

Even under the highly deferential standard of review, Prudential's denial of Andrews' benefits cannot be upheld.  The conflict of interest, the inadequate peer review, and failure to acknowledge the Social Security disability determination in the face of substantial medical evidence indicating the permanent nature of Andrews' disability show that Prudential did not engage in a principled, deliberative reasoning process.  Prudential's decision to deny benefits was arbitrary and capricious.

Given this determination, Andrews' request for discovery is moot.

At the hearing, the Court asked the parties what benefits Andrews would be entitled to should the Court deny Prudential's motion.  Having considered both parties' arguments, the Court finds that Andrews is entitled to benefits for the first 24 months of his claim, from September 2006 through the end of August 2008.  This is because Prudential denied Andrews' claim for benefits within the first 24 months, during which he is entitled to benefits where he is unable to perform the duties of his own occupation. The question of whether Andrews is entitled to benefits after 24 months, where the Plan defines disability differently, was not before Prudential.  While this decision does not extend beyond finding Andrews disabled within the first 24 months, it would appear that Andrews would meet the Plan's definition of disability after 24 months.

SO ORDERED.


Dated:  December 2, 2009            s/ Avern Cohn
                                    AVERN COHN
                                    UNITED STATES DISTRICT JUDGE

**08-14391 Andrews v. Prudential Ins Co of America, et al**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, December 2, 2009, by electronic and/or ordinary mail.

 s/ Julie Owens
Case Manager, (313) 234-5160